In the Matter of ROOSEVELT LANES, INC., Debtor.

No. 64–B–40.

United States District Court
E. D. New York.

Oct. 8, 1964.

Blumberg, Singer, Ross & Gordon, New York City, for petitioner, Frederick Newman, New York City, of counsel.

Bennett E. Aron, West Hempstead, N. Y., for respondent.

ZAVATT, Chief Judge.

This is a petition to review the order of Referee Rudin, dated May 15, 1964, denying the petition of Brunswick Corporation (formerly The Brunswick Automatic Pinsetter Corporation) for an order of reclamation of 40 pinsetters sold by the petitioner (hereinafter referred to as Brunswick) to the debtor under a conditional sales contract, dated June 29, 1959. The debtor operates a 40 lane bowling establishment in Roosevelt, Nassau County, New York. The conditional sales contract was duly and timely filed in the office of the Clerk of Nassau County on July 1, 1959, New York Personal Property Law, McKinney's Consol.Laws c. 41, §§ 65, 66 and was duly and timely refiled. New York Personal Property Law, § 71. The Referee denied the petition upon the ground that a written agreement between the debtor and Brunswick, dated May 9, 1963, which modified the amount of certain installment payments, extended the term for the payment of the unpaid time balance and added an "extension charge" for the financing of the indebtedness over the extended period, rendered the conditional sales contract invalid as against the debtor-in-possession for failure of Brunswick to file the extension agreement; that this agreement "created an entirely new agreement" ; that the changes effected thereby were substantial; that Section 66-a of the New York Personal Property Law required that the extension agreement be filed.

### The Facts

The cash price of the pinsetters was $8,100 each, or a total of $324,000 for 40 such pinsetters. The debtor made a down payment of $20,000 and desired to finance the unpaid balance of $304,000 over a period of eight years. Accordingly, there was added to the unpaid balance of $304,000 a finance charge of $79,040 for the

financing over the eight year period, thus bringing the debtor's total obligation to the sum of $383,040. The conditional sales contract does not state separately the unpaid balance of principal ($304,-000) and the precalculated finance charge. Rather it lumps principal and finance charge as follows:

| | | |
|---|---:|---:|
| Total purchase price ................................ | | $403,040 |
| Heretofore paid ......................... | $ 4,000 | |
| Paid on contract ......................... | 16,000 | 20,000 |
| Deferred time balance .......................... | | $383,040 |

———◆———

This deferred time balance was to be paid as follows, beginning July 20, 1959:

Weekly payments equal to 12¢ per game bowled during the preceding week. Should the weekly payments during August 1959 and thereafter be less than the stated monthly minimum payments the debtor was required to pay the deficiency on the 10th day of the succeeding month.

Monthly minimums:

| | |
|---|---:|
| October through May | $5,000 |
| June through September | 2,000 |

On the basis of these monthly minimums, the final installment would have been paid in June 1967 and it would appear that the finance charge was computed accordingly. For the contract provides "after full payment of the purchase price and the amounts due hereunder the Seller shall give the Buyer a finance charge credit for payments in excess of the monthly minimums at the rate of 6% per annum." It will be noted that the finance charge under the original contract amounts to 26% of the unpaid balance of principal of $304,000. In the trade this is known as an "add-on." The "add-on" per year (over an eight year period) is 3.25 applied to the original amount of principal. The actuarial rate of return on this amount based on the minimum monthly installments payable over an eight year period is slightly less than 6% per annum. Financial Rate Translater and Guide to Legal Installment Sales Rates, prepared by Financial Publishing Company, 82 Brookline Avenue, Boston 15, Massachusetts.

As of May 9, 1963, the debtor was in default. The unpaid "deferred time balance," exclusive of unearned finance charge, was $254,362.52. There was also due the further sum of $7,920 as interest, at the rate of 6% per annum, on late payments of installments. In response to the debtor's pleas for more time, a written extension agreement was executed by the conditional vendor and the conditional vendee, dated May 9, 1963. When the extension agreement was executed, no new note was executed nor was the original conditional sales contract or the original conditional sales promissory note, each dated June 29, 1959, surrendered. The unpaid balance was recalculated as follows:

| | |
|---|---:|
| Unpaid balance, excluding unearned finance charge ....... | $254,362.52 |
| Interest due on late payments, at 6% ................... | 7,920.00 |
| Finance charge on $262,282.52 for seven years .......... | 73,439.11 |
| | $335,721.63 |

The provision of the original contract as to installment payments was modified. Whereas the original contract and promissory note required monthly minimum payments of $5,000 for the months of October through May of each year and of $2,000 for the months of June through September of each year (a total annual minimum of $48,000), the extension agreement required only eight monthly minimum installments of $5,995 each year or an annual total of $47,960, except that the final monthly minimum was fixed at $5,996.63, so that, over a period of seven years from March 15, 1963 (the due date of the first installment under the extension agreement), the total sum of $335,721.63 would have been paid. Although the original contract would have been paid in full according to its terms by June 1967, the extension agreement extended the date of final payment to March 15, 1970. In addition, the finance charge under the extension agreement was increased to an "add-on" of 28% for the seven year period, the equivalent of simple interest at the rate of 7.3% per year, whereas under the original contract the rate of interest was slightly less than 6% per annum.

The extension agreement refers to the conditional sales contract and promissory note, each dated June 29, 1959, and provides:

"4. All of the terms and conditions of the aforesaid instruments shall remain in full force and effect except insofar as the terms of payment are modified and extended by this Agreement.

"5. This Agreement shall remain in full force and effect until said indebtedness shall have been paid in full by the Purchaser to Brunswick. In the event that Purchaser shall at any time hereafter fail to pay any of the installments as set forth herein, Brunswick may, at its option, declare this Agreement null and void and proceed in accordance with the terms of the aforesaid instruments as though this Agreement had never been executed."

The conditional sales contract provides:

"4. Title to said property shall not pass to Buyer until the total amount payable as herein provided is actually paid in cash.

\* \* \* \* \* \*

"8. It is agreed that the Brunswick Automatic Pinsetters shall at all times be considered personal property and that they shall not be deemed to be attached or affixed permanently to the premises or to the bowling lanes on which the said property is to be installed. The Seller shall have the right to remove said property in the event of a default in this contract by the Buyer.

\* \* \* \* \* \*

"10. If the Buyer shall default in the payment of any amount for which the Buyer is liable hereunder, it being agreed that time is of the essence of this contract, or shall fail to comply with any of the conditions hereof, or if any proceeding in bankruptcy, receivership or insolvency is instituted by or against the Buyer, \* \* \* then in any such event the full amount remaining unpaid by the Buyer may, at the Seller's election, become immediately due and payable. The Seller's acceptance thereafter of any payment, or any agreement for the extension of the time of payment between the Seller and the Buyer, or other indulgence granted the Buyer, shall not be deemed to alter or affect the Buyer's obligations or the Seller's rights hereunder with respect to any subsequent payments, default, or any other rights under this contract.

"11. If the Buyer defaults in complying with any of the terms hereof or upon the happening of any of the events which under the provisions of paragraph 10 above give the Seller the right to declare the balance immediately due and payable, the Seller, to the extent not prohibited by law, may take immediate

possession of said property and for this purpose the Seller may enter the premises where said property may be and remove the same, without notice or demand, and with or without legal process; thereupon all the rights and interests of the Buyer to and in said property shall terminate * * *."

The debtor failed to pay in full the first installment due under the extension agreement on March 15, 1963, and failed to pay any part of the subsequent installments due April 15, May 15, October 15, November 15, December 15, 1963 and January 15, 1964. Rather, on January 14, 1964, it filed a petition for an arrangement under Chapter XI, Section 322 of the Bankruptcy Act, 11 U.S.C. § 722. The matter was referred to Honorable William J. Rudin, Referee in Bankruptcy and an order of this court was made and entered authorizing the debtor to continue the operation of its business as debtor-in-possession. Thereupon, Brunswick made a demand upon the debtor for the surrender of the 40 pinsetters and, upon the debtor's refusal to comply, filed its petition for an order directing the debtor to surrender the same to Brunswick.

In its answer to the petition the debtor admitted the basic facts hereinabove stated. However, it alleged that "when new and different arrangements were made to pay * * * in fifty-six (56) installments, the parties intended to and did alter and make radical changes in the terms' and conditions of the conditional contract of sale, dated June 29, 1959, in so far as it was inconsistent with the new agreement, and it was likewise their intention that the new agreement, dated May 9, 1963, would take the place of the old agreement." It claimed that the new agreement came within the purview of Section 66–a of the New York Personal Property Law so as to require "the making and filing of a new conditional sales contract" ; that, for failure to so file, "such title as the reclaimant may have had in the forty (40) Brunswick Automatic Pinsetters is void and the reclaim-

ant lost its lien and security, and the debtor-in-possession is the absolute owner of the * * * Pinsetters * * *."

By virtue of Section 70, sub. c of the Bankruptcy Act, 11 U.S.C. § 110, sub. c, the trustee of the estate of a bankrupt is vested as of the date of bankruptcy with all the rights, remedies and powers of a lien creditor, whether or not such a creditor actually exists. He can take advantage of an improper filing of or the failure to file a conditional sales contract. Empire State Chair Co. v. Beldock, 140 F.2d 587 (2d Cir.), cert. denied, 322 U.S. 760, 64 S.Ct. 1278, 88 L.Ed. 1587 (1944). By virtue of Section 342 of the Bankruptcy Act, 11 U.S.C. § 742, a debtor-in-possession has all the title and shall exercise all the powers of a trustee appointed under the Act, subject only to the orders of the court. The debtor-in-possession in the instant case, therefore, may oppose Brunswick's reclamation petition and may take any other appropriate steps to have the conditional sales contract declared invalid as to creditors and to have Brunswick treated as an unsecured creditor. Whiteford Plastics Co. v. Chase Nat'l Bank, 179 F.2d 582 (2d Cir. 1950) ; Empire State Chair Co. v. Beldock, supra; In re Martin Custom Made Tires Corp., 108 F.2d 172 (2d Cir. 1939).

At the hearing before the Referee, the debtor rested upon the documents received in evidence and the concession of Brunswick that the extension agreement had not been filed. It offered no evidence to support the allegation of its answer that it was the intention of the parties that the extension agreement would take the place of the original conditional sales contract. Rather, it rested on its contention that Section 66–a of the New York Personal Property Law required the filing of a new conditional sales contract. The Referee concluded, as a matter of law, that the conditional sales contract dated June 29, 1959, was invalid as against the debtor-in-possession because of the failure of Brunswick to file the extension agreement pursuant to section 66–a.

Section 66–a of the New York Personal Property Law was added by L. 1933, ch. 572, effective April 28, 1933. It provides:

"§ 66–a. Additions to conditional sales contract

"No conditional sales contract once filed can have any addditions made to it so as to include other purchases or transactions between the same parties. A new contract must be made and filed."

The legislative history of section 66–a is found in the Governor's Bill Jacket,[1] in which are preserved a telegram from Charles Poletti, counsel to Governor Lehman, to Assemblyman Anthony J. Canney, author of the Bill (Int. 1616. Pr. 1793); the Assemblyman's reply and a memorandum of Henry Epstein, Solicitor General to the Governor. In response to the telegram requesting a memorandum setting forth the need and purpose of the Bill, Assemblyman Canney made it clear that the Bill was intended to apply to new purchases by a conditional vendee from a conditional vendor which were being added to the original contract without the filing of a new conditional sales contract:

"ASSEMBLY CHAMBER
STATE OF NEW YORK
Albany
Buffalo, N. Y.
April 17, 1933

Anthony J. Canney
41 Marvin Street
Buffalo, N. Y.

Mr. Charles Poletti
Governor's Councel [sic]
Executive Chamber
Albany, New York

Re: Int. 1616 Pr. 1793

Dear Mr. Poletti:

Your telegram of April 15th received.

During the past three years the Credit Houses have divised [sic] a new scheme. People go to these places and purchase clothing, furniture, etc., and instead of writing a new contract for each article purchased, these companies add to the original contract. I have had any number of these people come to my house during the depression. One woman whom I know very well bought kitchen equipment and, after having this all payed for, with the exception of a few dollars, ordered a bedroom suite and parlor furniture. These were three individual purchases made at different times. Times then got bad, her husband lost his job, the Credit House came and took *all* her furniture away, and mind, she had her kitchen and bedroom furniture all paid for, but this Credit House added the additional sales to the original contract.

There have been any number of cases like the above mentioned and if Governor Lehman signs this measure it will do away with this evil.

This measure will not allow any Credit House to add to original sales but each sale must be filed on a new contract.

Hoping this gives you the required information, I am,

Respectfully yours,

AJC:OD    Anthony J. Canney
Member of the Assembly"

The memorandum of the Solicitor General supplies further evidence that the intent of section 66–a was to require the filing of a new conditional sales contract whenever there was an addition to or a reduction of the items covered by a contract of sale which reserved title to the items in the conditional vendor:

"Memorandum for the Governor

Re: Assembly Bill Int. 616 Pr. 1793 [sic]

Amending Conditional Sales Law.

The proposed amendment is aimed to prevent insertions in or additions

1. A public record on file in the Legislative Reference Library of the New York State Library at Albany, New York.

to an already existing and filed conditional sales contract which either reduce the items therein or add thereto without another contract being filed. Presumably irregularities have arisen due to filing added schedules or modified schedules to an already filed contract,. thus creating confusion and litigation.

I do not know the background of the proposed measure, but can see no valid objection thereto. It may require more formality, but it does tend to clarify the rights of the parties as to such items which may subsequently be made the subject of such conditional sales contract. In such manner it would tend to minimize litigation and clarify issues therein.

Dated: April 18, 1933.
s/ Henry Epstein
Henry Epstein
Solicitor General"

Shortly after the effective date of section 66–a, the General Counsel to General Motors Acceptance Corporation (G. M.A.C.) wrote to Assemblyman Canney. He stated that his client was "interested in determining what additions to conditional sales contracts are prohibited within the meaning of this section." He advised the addressee that G.M.A.C. purchases conditional sales contracts on products of General Motors Corporation and its affiliated companies and that when the terms of payment have not been complied with by the purchaser because of economic conditions, "in many cases *terms of payment were modified.* These modifications are in writing but it has not been the practice to file the same * * *. It may be that Section 66a does not contemplate such modifications, but we would like to know whether they are 'additions' within the intent of the section." The reply of the author of section 66–a reveals the abuses by credit houses it was intended to reach and the fact that this section was not intended to apply to modifications of the terms of payment under a conditional sales contract:

"ASSEMBLY CHAMBER
State of New York
Albany

(EMBLEM)
ANTHONY J. CANNEY
41 Marvin Street
Buffalo, N. Y.

Buffalo N. Y.
July. 22. 1933 [sic]
Mr John T. Smith
General Counsel
General Motors Corporation
Broadwat [sic] at 57th Street,
New York, New York.

Dear Sir:

I am in receipt of your letter of July 12th regarding the Personal Property Law Chapter 572 of the laws of 1933.

This law was drafted by myself after a complete study of the abuse by the Credit Houses in the City of Buffalo N.Y.

During the past three years the Credit Houses have divised [sic] a new scheme. People go to these places and purchase clothing furniture, jewelery [sic] etc., and instead of writing a new contract for each article purchases [sic] these companies add to the original contract, and then when purchaser became behind in payments the credit companies would seize all articles purchased.

Let me give you an example. A young couple purchased a Parlor Suite for $175.00 and after having all but $3.00 paid on it bought Kitchen and Bedroom furniture for $300.00 and after paying on this for many months bought during the course of the next year at different times articles amounting to $45.00. When times got bad he lost his job after having paid $510.00 and with a balance due of $78.00, he was unable to pay, the credit houses seized all his furniture. Mind these arti-

cles were all purchased at differet [sic] times and should have been entered on separated [sic] contracts but due to an overzealous purchaser and a scheming owner of one of these credit houses he was deprived of all his furniture.

This is only of [sic] of the many cases that has take [sic] place place [sic] in just one city of New York State.

*After reading and studying your letter I fail to see where your line of business is in anyway effected [sic] by this Law. You write separate contracts for all your purchases.*

Hoping that this give [sic] you the required information and if anything further you would like to know I will be glad to explain it to you. (Emphasis added.)

       Very truly yours
       Anthony  J.  Canney" [2]

Although there are found in the Governor's Bill Jacket an unanswered letter of the general counsel of General Motors Corporation to a counsellor to the Governor, expressing doubt as to whether the then pending bill contemplated modifications of the terms of payment,[3] and an unanswered letter of the managing director of the Refrigerator Association of New York, Inc. to Governor's counsel objecting to "its ambiguity," there is nothing in the legislative history to suggest that section 66–a was intended to apply to agreements extending the time within which to pay for items, all of which are covered by a previously filed conditional sales contract.

Although section 66–a was enacted and became effective in 1933, neither the research of counsel nor that of the court have lead to the discovery of an interpretive decision by any New York court. The only reported case in which this section has been considered thus far is In the Matter of Amity Dyeing & Finishing Co., 200 F.Supp. 823 (S.D.N.Y.1962), aff'd sub nom. Davis v. P. R. Sales Co., 304 F.2d 831 (2d Cir. 1962). There, an order of the referee in bankruptcy denied the petition of a conditional vendor, P. R. Sales Company, to reclaim machinery in the possession of the trustee which had been sold to the bankrupt, Amity, under two conditional sales contracts one dated July 25, 1957 and one dated February 6, 1958, each of which covered different items of machinery, delivered to the place of business of the vendee, Amity (a New York corporation), at Glendale, Queens County, New York. The contracts were properly filed in Queens County. In 1959, with the permission of the vendor, P.R., Amity moved its business and the P.R. machinery to Norwich, Connecticut, and P.R. filed the original conditional sales contracts with the Town Clerk of Norwich, under the Connecticut conditional sales statute. Conn.Gen.Stat. § 42–77 (1958). Shortly thereafter, Amity found itself in financial difficulties, negotiated with P.R. and reached an agreement in August of 1959, whereby P.R. returned to Amity the unpaid notes held pursuant to both contracts and received from Amity one new series of notes, dated August 1, 1959, equal to the combined balance due for the machinery sold under both contracts. Whereas the final note in the series held pursuant to the 1957 contract had become due in February 1959 and that pursuant to the 1958 contract was to become due in July 1960, the final note in the new series was to become due July 1, 1961. This transaction was not reduced to writing (except for the execution and delivery of the new notes) nor did P.R. file any notice thereof in either Norwich, Connecticut or in Queens County, New York, the principal place of business

---

**2.** Brief on appeal of General Motors Acceptance Corporation as amicus curiae, at pages 21a–28a, in In the Matter of Amity Dyeing & Finishing Co., in the United States Court of Appeals, Second Circuit, hereinafter referred to.

**3.** "It may be that the bill does not contemplate such a transaction although it may very easily be covered by the amendment."

specified in Amity's certificate of incorporation. The referee held that the agreement of August 1, 1959, was an addition to the original sales contracts within Section 66–a of the New York Personal Property Law and was required to be filed in Queens County, New York, because it was a New York corporation whose certificate of incorporation specified Queens County as its principal place of business; that the failure of P.R. to file the new agreement rendered its reservation of title to all the machinery sold by it to Amity void as against the trustee by virtue of § 65 of the New York Personal Property Law. On P.R.'s petition to review this order, it contended that Connecticut not New York law governed and that it had fully complied with Connecticut law by filing the original contracts there on June 26, 1959.[4] P.R. contended further that, if New York law governed, its August 1959 agreement with Amity was not an addition to the original contracts requiring the making and filing of a new contract under § 66–a.

Judge Bryan did not reach the question raised by P.R. of whether or not the law of New York or that of Connecticut applied. He did hold that "[t]he failure of the vendors to file the new August 1959 agreement anywhere necessarily renders such title as it may have had void as against the trustee." 200 F. Supp. at 828. He regarded the new notes which extended the time for payment of the original two series by more than two years and one year respectively, as "an entirely new conditional sales agreement with quite different terms and conditions from those of either of the two previously filed * * *." 200 F.Supp. at 826.

"Assuming New York law applies, the transaction is governed by §§ 65 and 66–a of the New York Personal Property Law. At the very least this was an agreement coming within the purview of § 66–a. It is certainly an 'addition' to the original conditional sales contracts so as to include 'other purchases or transactions between the same parties.' Thus, under § 66–a it was required that 'a new contract must be made and filed.'

"This is quite apart from the question as to whether the new agreement was required to be filed as an original conditional sales contract under § 65. * * * I am inclined to the view that even in the absence of § 66–a filing would have been required under § 65." 200 F. Supp. at 826.

The Court of Appeals concluded that the law of Connecticut, not that of New York, was controlling and that a filing of "the new agreement was necessary in order to render the reservation of title valid as to creditors." 304 F.2d at 834. It is worthy of note that the applicable Connecticut statute [5] requires that a conditional sales contract shall describe "the property and all conditions of such sale" and that the Connecticut courts have held that a conditional sales contract is invalid as to third parties if it fails to state precisely on what dates the installments are due. General Motors Acceptance Corp. v. Cirone, 146 Conn. 64, 147 A.2d 481 (1958); Rhode Island Hospital Nat'l Bank v. Larson, 137 Conn. 541, 79 A.2d 182 (1951); C. I. T. Corp. v. Meyers, 129 Conn. 514, 29 A.2d 758 (1942). The Connecticut courts have steadily enforced a policy of strict compliance with their statute requiring conditional sales contracts to contain "all conditions" of the sale. For example, in Brunswick-Balke-Collender Co. v. Thomas, 151 F.2d 892 (2d Cir. 1945), the denial of a petition

4. Conn.Gen.Stat. § 42–77 (1958): "Except as otherwise provided in this chapter, all contracts for the sale of personal property, conditioned that the title thereto shall remain in the vendor after delivery, shall be in writing, describing the property and all conditions of such sale, and shall be acknowledged before some competent authority and filed within a reasonable time in the town clerk's office in the town where the vendee resides; * * *."

5. See footnote 4.

for reclamation of bowling alleys was affirmed because the contract did not specify separately the purchase price and the transportation and installment charges; rather the price and these incidental charges were stated in one sum as the purchase price. "Hence we must hold that this contract does not state all of the conditions of the sale as required by the statute." 151 F.2d at 893. In New York State, on the other hand, the only statutory requirement for itemization is found in Section 64–a of the Personal Property Law which applies only to conditional sales contracts for the sale for $3,000 or less of goods for any use other than a commercial or business use.[6] Such contracts must state separately the cash price and the credit service charge. The penalty for failure to comply is not as drastic as is the failure under the Connecticut statute to state "all conditions" of a conditional sale.

Failure to comply with the provisions of section 64–a does not render void as to anyone the vendor's reservation of title. It merely gives the vendee the "right to recover an amount equal to the credit service charge (or ten per centum of the cash price if no credit charge is specified in the contract or supplementary statement) from the original seller." In Amity, the Court of Appeals affirmed not because of a mere extension of the time for payment but on the stated ground that "the new arrangement * * * was more than a mere extension, for the new notes covered the combined balance remaining due on the two series of old notes, reduced the payments by one-half and extended the time of maturity by one year. Moreover, appellant returned the old series of notes to the debtor. All of which amply supports the conclusion of the District Court that this constituted a *new* agreement under the law

---

6. "§ 64–a. Contents of certain conditional sales contracts

\* \* \* \* \* \* \* \* \* \* \*

"Every such contract must contain:

"(a) The name of the seller and the buyer.

"(b) The principal place of business of the seller and the residence of the buyer.

"(c) The date of sale.

"(d) A description of the goods sold with the exception that the serial number or numbers thereof or similar information may be inserted in the seller's copy of such contract after the date of its execution.

"(e) A statement of the transaction, itemized in figures in the following categories in form substantially as follows:

Cash price ............................................... $

Credit service charge ....................................

Insurance premium (if any) ..............................

Other charges, if any, (itemized)

............................................. $

.............................................

.............................................

"Total purchase price ....................................$

Down payment

"(a) Cash ............................. $

"(b) Allowances .......................

"(c) Other credit ......................

Balance payable in installments ..........................$

"(f) The amount of each payment succeeding the down payment and the due date or period thereof and the place where such payments are to be made.

\* \* \* \* \* \* \* \* \* \* \*

"(h) \* \* \*

"In case of failure to comply with the provisions of this section the buyer shall have a right to recover an amount equal to the credit service charge (or ten per centum of the cash price if no credit charge is specified in the contract or supplementary statement) from the original seller.

"The provisions of this section shall not apply to the retail instalment sale of motor vehicles or goods as defined in articles nine and ten of this chapter."

of Connecticut." 304 F.2d at 835. It should be noted that the Court of Appeals did not interpret either Section 65 or Section 66–a of the New York Personal Property Law. This is the case upon which the Referee relied for his denial of Brunswick's reclamation petition.

The new agreement in Amity was a novation. The obligations under the two separate series were extinguished, the original two series were surrendered and one combined obligation substituted therefor. In the instant case there was no novation. Inman v. F. N. Burt Co., 124 App.Div. 73, 108 N.Y.Supp. 210 (3d Dep't 1908), aff'd, 195 N.Y. 558, 88 N.E. 1121 (1909). In Amity, the parties did what had concerned the New York State Legislature when it enacted § 66–a. The conditional vendee was deprived of the right to pay the indebtedness under one conditional sales contract and to acquire title to the subject matter thereof. After the one new series had been substituted for the original two series of notes, a default under the new series would entitle the vendor to seize all of the property sold under both contracts.

The debtor does not contend that § 65 of the New York Personal Property Law requires that the extension agreement be filed.[7] It relies solely upon § 66–a. Although § 65 has been in effect for 42 years, there is no reported case in which it has ever been claimed, much less held, that it applies to an extension agreement such as that in the instant case. There is a reported case in the Sixth Circuit, Arthur v. G. W. Parsons Co., 224 F. 47 (6th Cir. 1915), involving Section 8568 of the General Code of Ohio relating to a reservation of title to property covered by a conditional sales contract which provided that such a reservation was void

as to subsequent creditors, purchasers and mortgagees in good faith, unless:

> " 'the conditions are evidenced by writing, signed by the purchaser, * * * and also a statement thereon, under oath, made by the person so selling, * * * of the amount of the claim, * * * be deposited with' the recorder of the proper county." 224 F. at 49.

In that case, the conditional vendor sought to repossess certain machinery from the trustee in bankruptcy. The conditional sales contract was duly recorded and set forth all the conditions regarding payment of the purchase price, including the fact that promissory notes were given in payment therefor. These notes, which were not recorded, contained the additional provisions whereby failure to pay interest when due accelerated the maturity of the entire indebtedness and raised the interest thereon from six per cent, as provided in the contract, to eight per cent. Relying upon this provision of the unrecorded notes, the trustee urged that all the conditions of the sales contract were not filed and that the contract was void as against the trustee. Neither the referee, the District Court, nor the Court of Appeals agreed, each finding that recordation of the notes was unnecessary. It was further alleged by the trustee that renewals of these promissory notes after the contract had been filed amounted to an alteration of the original contract and thereby vitiated the conditional vendor's priority to this machinery. As to this contention the Court of Appeals noted that:

> "The statute, however, makes no provision for a refiling of the contract, and in the absence of such provision we cannot believe that it

---

7. "§ 65. Conditional sales void as to certain persons

"Every provision in a conditional sale reserving property in the seller shall be void as to any purchaser from or creditor of the buyer, who, without notice of such provision, purchases the goods or acquires by attachment or levy a lien upon

them, before the contract or copy thereof shall be filed as hereinafter provided, unless such contract or copy is so filed within ten days after the making of the conditional sale. This section shall not apply to conditional sales of goods for resale."

was the intention of the Legislature to accomplish a result so inequitable as the loss of the vendor's lien or title through the mere renewal (in accordance with what the Legislature must have known was not uncommon practice) of unpaid promissory notes given for purchase price. Had the Legislature intended such result, the natural evidence of such intention would be the requiring of record of a new notice of every change in the amount or form of indebtedness subsequent to the original filing of the contract." 224 F. at 51.

In In re Savoia Macaroni Mfg. Co., 79 F.2d 530 (2d Cir. 1935), decided after the enactment of section 66–a, the Court of Appeals for this Circuit was presented with a somewhat analogous situation. In that case the conditional vendee encountered financial difficulties after the filing of the conditional sales contract. Its creditors met and drafted a tentative agreement, to become effective upon the signature of two-thirds of the creditors not secured by mortgages, under which the creditors agreed to accept repayment of their claims over an extended period of time. Although the conditional vendor signed this agreement, two-thirds of the creditors did not and the agreement never became effective. Notwithstanding this fact, the trustee argued that the conditional vendor had waived its conditional sale lien by signing the extension agreement. In reversing the District Court, the Court of Appeals rejected this contention:

> "The purpose of the agreement is indicated by the recital that the signatories believe that the bankrupt could become prosperous and that they desired to give it a chance to do so by accepting an arrangement for the payment of their debts over a reasonable period of time.
>
> " * * * They agreed, however, only to stay proceedings in order

to allow the debtor more time. This the agreement makes clear.

> "The purpose of the agreement was to delay the collection of debts. * * * The proceeding was, as far as the appellants (conditional vendors) are concerned, the same as if they had received a note from the conditional vendee—the bankrupt— which allowed it an extension of the time to pay. By the receipt of such a renewal note, the conditional vendors do not waive their lien. Arthur v. G. W. Parsons Co., 224 F. 47 (C.C.A.6); Beall v. Hudson County Water Co., 185 F. 179 (C.C. N.J.). * * *
>
> "The consideration for the agreement in the instant case is forbearance in the exercise of the rights of action. But this does not mean that the status of the rights as liens should be affected by mere agreement to stay the exercise of the rights. Forbearance does not mean surrender." 79 F.2d at 532."

If every extension of time is an "addition" and therefore a new agreement, a conditional seller would grant any leniency to a buyer at the risk of losing its title as to lien creditors, trustees in bankruptcy, debtors-in-possession. Out of an abundance of caution, all such vendors would be compelled to suffer no delay in the payment of any installment and to repossess its property immediately upon any default. This would result in great commercial inconvenience to those, with limited funds, who desire to embark upon business enterprises, as well as to those conditional vendors who are willing to assist vendees who find themselves financially unable to comply with the strict letter of the terms of conditional sales contracts.

In the instant case the court must apply a state statute which has never been construed by the courts of that state. In such a situation, the federal court, guided by analogous decisions and

## 854

its own judgment as to the meaning and legislative policy underlying the statute, must determine what the state courts would probably do. See Ricciuti v. Voltarc Tubes, Inc., 277 F.2d 809, 812 (2d Cir. 1960). See also, Travelers Ins. Co. v. Hernandez, 276 F.2d 267, 270 (5th Cir. 1960); Doethlaff v. Penn Mut. Life Ins. Co., 117 F.2d 582, 584 (6th Cir.), cert. denied, 313 U.S. 579, 61 S.Ct. 1100, 85 L.Ed. 1536 (1941); 1A Moore, Federal Practice ¶ O.309[2], at 3327 (2d ed. 1961).

■■ In light of the obvious legislative intent, the court cannot agree with the wooden literalness of the interpretation of § 66–a now under review. "There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure." Central Hanover Bank & Trust Co. v. Comm'r of Internal Revenue, 159 F.2d 167, 169 (2d Cir.) (L. Hand, J.), cert. denied, 331 U. S. 836, 67 S.Ct. 1518, 91 L.Ed. 1848 (1947). Moreover, "where great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature be plain; in which case it must be obeyed." United States v. Fisher, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304, 313 (1804).

■ The court determines that § 66–a of the New York Personal Property Law is limited in its application to additional purchases; that an extension agreement such as that in the instant case does not come within the purview of § 66–a; that the reservation of title in the petitioner to the 40 pinsetters which are the subject of the conditional sales contract between Brunswick and the debtor is not rendered invalid as to the debtor-in-possession, a trustee in bankruptcy or lien creditor for failure to file the same.

The order of the Referee in Bankruptcy is reversed. Settle an order consistent herewith on or before fifteen (15) days from the date hereof.